IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JESSE CLEMENTS #35551,

      Plaintiff,

v.                                     CIV 15-1017 MV/KBM

GEO GROUP, INC. AND
CORIZON, INC.,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER comes before the Court on Defendant GEO Group, Inc.'s

*Martinez* Report (*Doc. 52*) and Defendant Corizon's *Martinez* Report and Motion for

Summary Judgment (*Doc. 54*) ("Defendants' Motions for Summary Judgment"), both

filed April 11, 2017. The Honorable Martha Vazquez referred these motions to me on

June 13, 2017. *Doc. 60* at 1. Pursuant to this Court's Order of January 12, 2017,

Plaintiff's responses to these motions were due by May 11, 2017. *Doc. 49*. Also before

the Court is Plaintiff's letter of June 21, 2017 (*Doc. 61*), which the Court construes as a

request for a Settlement Conference and which Defendants oppose (*Docs. 63 & 64*).

For the reasons that follow, the Court recommends that Plaintiff's request for a

settlement conference be denied, summary judgment be entered in favor of Defendants,

and that this action be dismissed with prejudice.

### I.    Plaintiff's Claims

Factually, Plaintiff alleges that on or about May 3, 2014, correctional officers

entered his cell, conducted a strip search, and handcuffed him behind his back, despite

his request that he be handcuffed in the front or double-handcuffed because of shoulder injuries. *Doc. 1*, Ex. A, at ¶ 20, 22, 23-28. According to Plaintiff, he was required to sit, handcuffed, in a plastic chair for over two and a half hours, while experiencing "severe pain and additional injuries to his shoulders," until Corrections Officer Baca handcuffed him in front. *Id*. at ¶ 37-38. Following this handcuffing incident, Plaintiff alleges that he continued to experience severe pain and weakened shoulders with popping and swelling but received only "minimal medical care." *Id*. at ¶ 40-41. Thereafter, on November 15, 2014, as he was attempting to exit the top bunk in his cell, Plaintiff contends that his "shoulder strength gave out and he fell and broke his lower hip socket and thigh bone." *Id*. at ¶ 42. Attributing his November 15, 2014 fall to his earlier handcuffing incident, Plaintiff asserts that he "fell because of his weakened and injured shoulders which resulted from the handcuffing incident." *Id*. at ¶ 42.

Legally, Plaintiff appears to assert the same claims against both Defendant Geo Group, Inc. ("Defendant GEO") and Defendant Corizon, Inc. ("Defendant Corizon"). These include alleged violations of his right to substantive due process under the Fourteenth Amendment (Count Two), violations of his Eighth Amendment rights (Counts One and Four), negligence *per se* (Count Five), and negligent medical care and treatment (Count Six). *Id*. at 7-11. Additionally, Plaintiff makes a general allegation that Defendants' "acts and omissions were pursuant to policy and custom causing the violation of [his] constitutional rights" (Count Three). *Id*. at 10.

## II.    <u>Background</u>

Plaintiff Jesse Clements ("Plaintiff") has failed to respond to Defendants' Motions for Summary Judgment, nor has he requested an extension of time to do so. As such,

he has not identified any facts proffered by Defendants which he disputes or pointed to evidence in the record to support his claims. *See* Fed. R. Civ. P. 56; *see also* D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted"). Thus, the undersigned will "accept as true all material facts asserted and properly identified in the summary judgment motion[s]." *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

Plaintiff is an inmate in the custody of the New Mexico Corrections Department ("NMCD") and, at times relevant to the Amended Complaint, was housed at Guadalupe County Correctional Facility ("GCCF") in Santa Rosa New Mexico. *Doc. 1*, Ex. A, at ¶ 4. NMCD has contracted with Guadalupe County to house its state prisoners at GCCF. *Doc. 52*, Exs. B & C. GCCF, in turn, has contracted with Defendant GEO to operate GCCF. *Doc. 52*, Exs. A, B & C.

Defendant GEO employs only security and non-medical staff at GCCF. *Doc. 52*, Ex. C. It has adopted policies and procedures designed to protect inmate safety and inmate rights. *Doc. 52*, Exs. C, D, & E. Additionally, it has agreed to abide by NMCD's policies and procedures governing inmate safety and inmate rights. *Doc. 52*, Exs. C, F, & G. Defendant GEO's employees receive refreshers in these policies and procedures on an annual basis. *Doc. 52*, Ex. C, at ¶ 9.

On May 1, 2014, GCCF was placed on institutional lockdown at the behest of then-Warden Erasmo Bravo. *Doc. 52*, Exs. H & I. While the lockdown was initially related to incidents of inmate aggression at GCCF, it continued by the direction of NMCD as part of a statewide operation called "Operation Contraband Free." *Id.* During

this operation, NMCD and GEO worked jointly in an effort to locate and eradicate drugs and drug-related contraband from NMCD facilities. *Doc. 50*, Ex. H.

Following the first statewide operation, NMCD directed that GCCF remain on full lockdown, and on May 3, 2014, NMCD initiated a second operation at the facility. *Id.* This second operation targeted inmates in Housing Unit II, where Plaintiff was housed, and was designed to address inmate aggression toward prison staff, gang tensions, and narcotics in the facility. *Id.* This operation was conducted entirely by officials from NMCD. *Id.* No employees of Defendant GEO were involved in searching inmates, developing protocols for the operation, monitoring inmates, or supervising the officers conducting the operation. *Id.*

Pursuant to its contract with Guadalupe County, NMCD retained the responsibility for providing, through a health care services contractor, health care services to inmates, including the provision of unimpeded access to sick call, 24-hour per day emergency medical care, regular physician visits, health care administration, and sufficient on-site medical staff. *Doc. 52*, Ex. B at 5, Ex. C at ¶ 10. At all times relevant to this lawsuit, NMCD contracted directly with Defendant Corizon, a private health care services company, to provide these medical services to NMCD prisoners at GCCF. *Doc. 52*, Ex. C, at ¶ 11-12. Defendant GEO, on the other hand, had no contractual relationship with Defendant Corizon. *Id.* at ¶ 19.

Defendant GEO's only duty with respect to inmate medical care was to "provide adequate space and security support." *Id.* at ¶ 13. It did not pay for any medical care provided to NMCD inmates. *Id.* at ¶ 20. Similarly, it did not employ any health care providers at GCCF; nor did any of its employees provide non-emergent medical

services or advice to GCCF inmates. *Id.* at ¶ 16-17. No employee of Defendant GEO had any personal involvement in diagnosing or treating Plaintiff's medical conditions or in hiring, retaining, training, or supervising any medical provider who was involved in diagnosing or treating Plaintiff's medical conditions. *Id.* at ¶ 18. Indeed, no GEO employees supervise Corizon employees. *Id.* at ¶ 21.

Generally, when a GCCF inmate requests medical care in a non-emergent situation, he must submit a health service request form. *Id.* at ¶ 14. Following the submission of such a form, employees of the health care services company schedule the inmate for an appointment. *Id.* Security personnel employed by Defendant GEO escort the inmate to and from the medical unit to been seen by medical providers at the scheduled time. *Id.* Defendant GEO's corrections staff are verbally instructed to refer any requests for medical attention to medical providers. *Id.* at ¶ 15.

At the time of the May 3, 2014 operation at GCCF, Plaintiff did not have a medical slip that exempted him from behind-the-back handcuffing. *Doc. 52*, Ex. H, at ¶ 17. In operations conducted by Defendant GEO, inmates are generally only exempted from behind-the-back handcuffing if they have a medical slip requiring as much. *Id.* It is not uncommon for inmates to complain about being handcuffed during security operations; they sometimes ask officers to remove their handcuffs or even fabricate medical conditions in an attempt to convince officers to remove them. *Doc. 50*, Ex. H.

Here, Plaintiff alleges that he received injuries to his shoulders as a result of being handcuffed behind his back for over two and a half hours during the May 3, 2014 operation. *Doc. 1*, Ex. A, at ¶ 20-27, 37-42. Prior to that date, he had a long history of orthopedic problems with his right shoulder, dating back to at least the mid-1980s, when

he had an open reduction and internal fixation with pinning at Eastern New Mexico Medical Center. *Doc. 54*, Ex. A, at ¶ 10. Before and after the May 3, 2014 handcuffing incident, Plaintiff's medical records demonstrate a consistent pattern of complaints related to his shoulders, with similar care required to address his complaints. *Id.* at ¶ 12. According to Robert D. Jones, M.D., a Certified Correctional Health Professional who serves as a Clinical Assistant Professor with the University of Arizona School of Medicine, the medical care provided by Defendant Corizon to Plaintiff for shoulder pain Plaintiff associated with the May 3, 2014 handcuffing incident met or exceeded the applicable standard of care, not only in a correctional setting, but also in any outside medical setting. *Id.* at ¶ 19.

On May 12, 2014, nine days after the handcuffing incident, Plaintiff submitted a Health Services Request Form, asking "to talk to someone about [his] shoulders." *Doc. 52*, Ex. K, at 1.  Plaintiff was seen by medical providers at GCCF the next day, on May 13, 2014. *Id.* Dr. Jones opines that the medical care, treatment and examination, and work-up of Plaintiff by Corizon in response were appropriate, did not cause any injury or damage to Plaintiff, and served to relieve his symptoms. *Doc. 54*. Ex. A, at ¶ 20.

The following month, on June 10, 2014, Plaintiff presented to the medical department. This time he reported that he had sustained an eye injury while using the bench press machine. *Doc. 52*, Ex. K, at 2. Then, on June 18, 2014, Plaintiff obtained a medical slip, which provided that he should be "double cuff[ed] . . . for medical purposes." *Id.* at 3.

Inmates at GCCF may be assigned to either top or bottom bunks in the housing units as security and space permit. *Doc. 52*, Ex. H. If inmates have medical conditions

that make it improper for them to be assigned to top bunks, they may obtain medical passes limiting them to lower bunk assignments. *Id.* at ¶ 19.  In November of 2014, Plaintiff did not have a lower bunk pass. *Id.* at ¶ 20.  He alleges that he was attempting to exit his top bunk on November 15, 2014, when his "shoulder strength gave out and he fell and broke his lower hip socket and thigh bone." *Doc. 1*, Ex. A, a ¶ 42.  According to Plaintiff, this November 2014 fall was a result of his "weakened and injured shoulders, which resulted from the handcuffing incident." *Id.* at ¶ 43.  As with the medical care provided following the May 3, 2014 handcuffing incident, it is Dr. Jones' opinion that no harm or damage of any kind was caused to Plaintiff as a result of medical care provided to him by Corizon following his November 15, 2014 fall. *Doc. 54*, Ex. A, at ¶ 28.

At all relevant times, GCCF had a policy and procedure governing inmate grievances. *See, e.g.*, *Doc. 52*, Exs. L & M. The grievance procedure consisted of three steps: (1) an inmate was required to file an Inmate Informal Complaint and attempt to resolve his complaint informally; (2) if the informal effort was unsuccessful, the inmate was required to file a formal Inmate Grievance; and (3) if the inmate was not satisfied with the disposition of the formal Inmate Grievance, he was required to appeal to the Office of the Secretary of Corrections. *Doc. 52*, Ex. L, at 11-16, Ex. M, at ¶ 3.

On or about June 19, 2014, Plaintiff filed an Inmate Informal Complaint regarding the May 3, 2014 handcuffing incident. *Doc. 52*, Ex. M, at ¶ 5, Ex. N, at 4.  Therein, he explained that he was handcuffed behind his back by an officer during a "shake-down," despite pleading with the officer not to do so because of shoulder injuries. *Doc. 52*, Ex. N, at 4. Sometime between July 2, 2014, and July 7, 2014, Plaintiff filed a formal

grievance, asserting that he had been subject to "excessive restraint behind [his] back." *Doc. 52*, Ex. M, at ¶ 5, Ex. N, at 1-3.  In his formal grievance, he sought "full medical examination and treatment to see what internal damage [he had] suffered" as well as compensation for pain and suffering. *Doc. 52*, Ex. N, at 1. The grievance officer determined that Plaintiff's formal grievance was untimely. *Id*. According to Steve Madrid, the Statewide Grievance Administrator Coordinator for NMCD, Plaintiff failed to file an Inmate Informal Complaint within five days of the May 3, 2014 handcuffing incident, or by May 8, 2014, and he therefore failed to comply with the applicable grievance process as to injuries sustained during that incident. *Doc. 54*, Ex. C, at ¶ 10. Although Plaintiff did file a grievance related to the handcuffing incident on or about June 19, 2014, he did not specifically grieve the medical care that he received. *Id*. at ¶ 11. Instead, he limited his grievance to being "excessively restrain[e]d" and suffering potential "internal damage" and pain and suffering.  *See Doc. 52*, Ex. N.

Plaintiff did not file any informal grievance, formal grievance, or a grievance appeal regarding his November 2014 fall from the top bunk. *Doc. 52*, Ex. M, at ¶ 6; *Doc. 54*, Ex. C, at ¶ 12. The Statewide Grievance Administrator Coordinator for NMCD confirmed as much following his review of Plaintiff's grievances. *Doc. 54*, Ex. C, at ¶ 12.

Katherine Armijo, who was familiar with Corizon's policies, procedures, and customs by virtue of serving as its Health Services Administrator at GCCF during the relevant time, states in her affidavit that "[n]one of the policies, procedures, customs or conduct of Corizon in any way prevents patients [from] receiving proper and appropriate care or encourages the denial of necessary or proper medical care." *Doc. 54*, Ex. B, at

¶ 9. According to Ms. Armijo, Corizon's policies, procedures, customs, and conduct, encouraged "the best quality of care, as mandated by the appropriate standard of care." *Id*. Plaintiff does not dispute that between February 4, 2014, and May 31, 2016, he had approximately 176 interactions or services provided to him by the health care services provider at GCCF. *Doc. 54*, at 50. Eighteen of these interactions with health care services at GCCF occurred between the time of the handcuffing incident and his fall from the top bunk. *Id*. at 13-17.

### III.   **Legal Standards**

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record and all of its reasonable inferences must be viewed in the light most favorable to the nonmovant, here, Plaintiff. *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

While the moving party bears the burden of showing that there are no genuine disputes of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party makes this showing by presenting "facts such that a reasonable jury could find in [its] factor." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

In a case in which the burden of persuasion at trial would be on the nonmovant, as here, the movant can meet Federal Rule of Civil Procedure 56's burden of production by either (1) providing affirmative evidence negating an essential element of the nonmovant's claim; or (2) showing the Court that the nonmovant's evidence is insufficient to demonstrate an essential element of the nonmovant's claim. *Celotex*, 477 U.S. at 331.

## IV.    Analysis

Defendants have each moved for summary judgment on Plaintiff's claims. *See Docs. 52 & 54.* Defendant GEO contends that Plaintiff failed to exhaust administrative remedies with respect to any claim that his November 15, 2014 fall was caused by the May 3, 2014 handcuffing. Additionally, it argues that there is no evidence to demonstrate that any of its employees violated Plaintiff's constitutional rights or that any policy or custom of Defendant GEO was the moving force behind the alleged violation of his rights. *Doc. 52* at 2. Defendant GEO also insists that any claims regarding the adequacy of Plaintiff's medical care against it must be dismissed, as Defendant GEO does not provide medical care at GCCF. *Id.*

Defendant Corizon contends, first, that Plaintiff failed to exhaust any of his administrative remedies and that his federal and state claims are therefore barred. *Doc. 54* at 50. Next, it maintains that Plaintiff's federal claims fail on their merits, because Plaintiff cannot meet either the subjective or objective tests for violation of the Eighth Amendment and has failed to assert any facts upon which a *Monell* claim could be premised against it. *Id.* at 51. Finally, Defendant Corizon contends that his state

claims fail, as the care that it provided to Plaintiff met the applicable standard of care and Plaintiff is unable to establish causation. *Id.*

For the reasons that follow, the Court concludes that Plaintiff has failed to exhaust his administrative remedies as to claims asserted in his Amended Complaint and also that his claims fail on the merits, entitling Defendants to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56.

### A. Exhaustion

"The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (citing 42 U.S.C. § 1997e(a)). The PLRA's exhaustion requirement applies to all inmate suits about prison life, irrespective of the type of wrong the prisoner alleges. *Porter v. Nussle*, 534 U.S. 516, 532 (2001).

Failure to exhaust is an affirmative defense under the PLRA. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, inmates are not required to specially plead or demonstrate exhaustion in their complaints. *Id.* "When raising an affirmative defense in a motion for summary judgment, the defendant must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Sparks v. Foster*, 241 F. App'x 467, 472 (10th Cir. 2007) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)) (internal quotation marks and ellipsis omitted) (unpublished). "If the defendant meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact[;] [i]f the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant is entitled to judgment as a matter of law."

*Id.*; *see* Fed. R. Civ. P. 56(a); *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)

(citing *Jones*, 549 U.S. at 212) ("Failure to exhaust under the PLRA is an affirmative

defense. . . . Defendants thus bear the burden of asserting and proving that the plaintiff

did not utilize administrative remedies . . . .")).

Here, GCCF's procedural requirements, as contained in their grievance policy,

defined the steps for Plaintiff's proper exhaustion of remedies.  *See Jones*, 549 U.S. at

218. If Plaintiff failed to complete the grievance process as laid out in the grievance

policy, he is barred from pursuing his claims under federal law. *See Little v. Jones*, 607

F.3d 1245, 1249 (10th Cir. 2010). Proper exhaustion is not satisfied when grievances

are dismissed because an inmate misses a deadline set out in an applicable grievance

procedure. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

Here, the applicable grievance process is set forth in NMCD Policy and

Procedure CD-150501. *See Doc. 52*, Ex. L, and *Doc. 54*, Ex. C. Under that policy, an

inmate must file an Inmate Informal Complaint within five calendar days of the date of

the incident giving rise to the complaint and must explain his complaint in detail to the

Unit Manager or designee. *See Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at  CD-

150501(A)(1)(a). Next, the policy provides: "[i]f this informal effort fails to resolve the

complaint within seven (7) working days of receipt of the complaint, the inmate may file

an Inmate Grievance form (CD-150501.1). The inmate must file the formal grievance

within five (5) calendar days of the date of the incident giving rise to the complaint."

*Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at CD-150501(A)(1)(b). The grievance officer must

review grievances for proper time limits and necessary information. *Doc. 52*, Ex. L, and

*Doc. 54*, Ex. C, at CD-150501(B)(2). An untimely grievance will be returned to the

inmate with an explanation of why it is being returned. *Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at CD-150501(B)(2). Otherwise, the grievance officer typically prepares a report and recommendation for the warden within fifteen (15) working days from receipt of the inmate's grievance. *See Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at CD-150501(B). The warden or his or her designee then makes a decision on the grievance – approving, disapproving, or modifying the disposition recommended by the grievance officer. *See Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at CD-150501(C). If the inmate is dissatisfied with the warden's decision, he has five days after receipt of the decision to appeal to the Office of the Secretary of Corrections. *See Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at CD-150501(D)(1).

Here, Defendants insist that, at minimum, Plaintiff failed to exhaust administrative remedies with respect to the claim that his November 15, 2014 fall was caused by his May 3, 2014 handcuffing or by the "minimal medical care" that he received thereafter.[1] In the Court's view, Plaintiff has not properly exhausted any of the claims contained within his Complaint.

Although Plaintiff did file an Inmate Informal Complaint regarding the May 3, 2014 handcuffing incident, he did not do so within five days. *Doc. 52*, Ex. N, at 4. In fact, he waited more than a month and a half after the handcuffing incident to do so. *See id*. The Inmate Informal Complaint form, completed by Plaintiff on June 9, 2014, advised him that formal grievances must be pursued "within 20 calendar days of the date of incident." *Id*. Curiously, this twenty-day deadline appears to be at odds with the grievance policy in place at the time, which required inmates to file formal grievances

---

[1] Defendant GEO contends that Plaintiff failed to exhaust administrative remedies with respect to any claim that his November 15, 2014 fall was caused by his May 3, 2014 handcuffing, while Defendant Corizon submits that Plaintiff failed to exhaust any of his administrative remedies.

"within five (5) calendar days of the date of the incident giving rise to the complaint." *Compare Doc 52*, Ex. N, at 4 *with Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at CD-150501(A)(1)(b). Given the conflict between the formal grievance form and the 2014 grievance policy, the Court suspects that the policy language may have been the result of a clerical error. Indeed, it would be counterproductive to require both the informal and formal grievance to be filed within five days of the subject incident, effectively leaving no opportunity for informal resolution before proceeding to a formal grievance. *See Doc. 52*, Ex. L, and *Doc. 54*, Ex. C, at CD-150501(A)(1) (explaining that "[b]efore using the formal grievance procedure, an inmate is expected to attempt to resolve the grievance or particular area of concern informally"). In any event, Plaintiff followed up with the filing of a formal grievance on July 2, 2014, which, as with the filing of his informal grievance, was more than five days and also more than twenty days after the handcuffing incident. The grievance officer returned Plaintiff's formal grievance to him on July 7, 2014, indicating that it was "not timely." *Doc. 52*, Ex. N, at 1.

Upon being notified that his formal grievance was considered untimely, Plaintiff provided a written response on the "Departmental Appeal" portion of the formal grievance form, indicating that he "disagree[d] that [his] grievance [was] untimely" and explaining that he delivered the formal grievance on July 2, 2014. *Id.* at 3. There is no indication that a departmental decision was ever made on Plaintiff's formal grievance or that any departmental appeal was permitted on Plaintiff's untimely grievance. *Id.* at 2. Although Plaintiff disputed the untimeliness of his formal grievance when it was returned by the grievance officer, the Court notes that whether the grievance was delivered by Plaintiff on July 2, 2014, as he suggests, or on July 7, 2014, it was properly

characterized as untimely under *both* the applicable grievance policy and the twenty-day deadline provided on the formal grievance form.  Moreover, according to the Statewide Grievance Administrator Coordinator, Plaintiff did not file any informal or formal grievances related to his November 15, 2014 fall from the top bunk.

The untimeliness of the informal and formal grievances filed by Plaintiff, which were limited to the May 3, 2014 handcuffing incident, is reason enough to reject his federal claims as unexhausted. For "[p]roper exhaustion demands compliance with an agency's deadlines," and the "PLRA exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 90-93.  Further, as to the claims that Plaintiff has asserted under New Mexico state law, N.M. Stat. Ann. § 33-2-11(B) (1978) provides that "[n]o court of this state shall acquire subject-matter jurisdiction over any complaint . . . filed by an inmate of the corrections department . . . that is substantially related to the inmate's incarceration . . . until the inmate exhausts the corrections department's internal grievance procedure." Given the lack of established state law interpreting § 33-2-11(B), New Mexico courts would look to the federal law, here cases interpreting the PLRA, as persuasive. As such, Plaintiff's state law claims are also unexhausted.

Even so, because PLRA exhaustion is not jurisdictional, a court may proceed to consideration of the merits of unexhausted claims, *see Woodford*, 548 U.S. at 101, which the Court will do here.

### B.    Substantive Due Process Claim

In Count Two of his Amended Complaint, Plaintiff asserts a claim against Defendants for a violation of his right to substantive due process under the Fourteenth Amendment. *Doc. 1*, Ex. A, at ¶ 57-63.  He alleges that "Defendants' malicious,

deliberate and intentional disregard of the known constitutional rights of Plaintiff was committed with deliberate indifference to his constitutional right to be free of injury and personal security when Plaintiff was injured and was not given proper medical treatment." *Id.* at ¶ 63. Yet, constitutional claims brought by a convicted inmate related to the conditions of his confinement must be brought under the Eighth Amendment, not under the more generalized provisions of substantive due process. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir. 1990). Given that Plaintiff brings claims arising out of his conditions of confinement at GCCF, the Court will analyze these claims under the framework of the Eighth Amendment.

### C.    Eighth Amendment Claims

Plaintiff alleges that Defendants violated his Eight Amendment rights by depriving him of "access to competent medical care while incarcerated." *Doc. 1*, Ex. A, at ¶ 54. The Eighth Amendment imposes a duty on prison officials to provide humane conditions with adequate food, clothing, shelter, and medical care and to take reasonable measures to guarantee the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825 (1994). With respect to the provision of medical care for inmates, the Supreme Court has distinguished "deliberate indifference to serious medical needs of prisoners" from "negligen[ce] in diagnosing or treating a medical condition," holding that only the former violates the Eighth Amendment. *Id.* at 835.

Deliberate indifference to serious medical needs of a prisoner involves the "unnecessary and wanton infliction of pain," either through the medical providers' response to the inmate's needs or through the corrections officers' intentional denial or delay of access to medical care. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

Neither an inadvertent failure to provide medical care, nor negligence in diagnosing or treating a medical condition will state a valid Eighth Amendment claim. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). A prisoner must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.  In order to do so, he must demonstrate: (1) that his medical needs were objectively sufficiently serious; (2) the prison official possessed a subjectively culpable state of mind (i.e. deliberate indifference); and (3) the inadequate medical care resulted in substantial harm. *Mata v. Saiz*, 427 F.3d 745, 751-52 (10th Cir. 2005).

Defendant GEO insists that Plaintiff has not, and indeed cannot, come forward with evidence demonstrating that any of its employees acted with deliberate indifference to his medical need. *Doc. 52* at 9. First, it notes that Plaintiff has not identified any employee of Defendant GEO who knew of and disregarded an excessive risk to his health and safety. *Id.* Defendant GEO emphasizes that no employee of Defendant GEO even provided medical care to inmates at GCCF or supervised anyone who did. *Id.* at 9-10. Although corrections officers may sometimes be liable under the Eighth Amendment for the intentional denial or delay of access to medical care, *see Estelle*, 429 U.S. at 104-05, Defendant GEO observes that Plaintiff has not alleged that any GEO employee delayed or impeded his access to medical staff at GCCF. *Doc. 52* at 10.

Based upon its review of the allegations contained in Plaintiff's Amended Complaint and the evidence provided as part of Defendants' Motions for Summary Judgment, the Court agrees that Plaintiff has not alleged or produced any evidence that employees of Defendant GEO were deliberately indifferent to his medical needs, even

by way of denying or delaying access to medical treatment. Plaintiff makes vague, conclusory allegations – for instance, that "Defendants' employees violated Plaintiff's right to be afforded a reasonable degree of safety from serious bodily injury" and "Defendants' policymakers were deliberately indifferent to conditions at the GCCF which permitted the deprivation of inmates' civil rights," *Doc. 1*, Ex. A, at ¶ ¶ 53, 70 – but he stops short of asserting that GEO employees denied or delayed him medical care. Plaintiff's medical records reveal that he was seen in the medical unit at GCCF numerous times for shoulder pain both before and after the May 3, 2014 handcuffing incident. *See Doc. 54* at 12-49.

Like Defendant GEO, Defendant Corizon maintains that Plaintiff has failed to set forth any evidence that its employees consciously disregarded his health or safety in violation of the Eighth Amendment. The Court agrees. The undisputed facts demonstrate that the treatment that Plaintiff sought and received for shoulder pain remained consistent before and after the May 3, 2014 handcuffing incident, suggesting no dramatic change in the condition of his shoulders following that incident. Plaintiff had been receiving treatment in both shoulders for years prior to May 3, 2014, which included the use of NSAIDS, decreases in activity, prescription medication, and sometimes steriodal injections with good results. *See, e.g.*, *Doc. 54*, Ex. A, at ¶ 12.

It is somewhat telling that Plaintiff did not request medical care for any shoulder injuries immediately following the May 3, 2014 handcuffing incident but, instead, sought treatment nine days later. Perhaps even more telling, just a month after the handcuffing incident, Plaintiff reported sustaining an eye injury sustained while using a bench press machine, which suggests that his shoulders at that time were in good enough condition

to engage in weightlifting. Additionally, a June 19, 2014 x-ray of Plaintiff's right shoulder showed no acute injury, no new fractures nor sublaxations and normal soft-tissue. *Id.* at ¶ 17. The x-rays were described as "unremarkable." *Id.* On September 4, 2014, Plaintiff had good range of motion and abduction, adduction, and internal rotation of his right shoulder. *Id.* at ¶ 18. While his trapezius area was tender to palpitation, the tenderness was determined to be muscular in nature. *Id.* Between September 4, 2014, and November 15, 2014, Plaintiff was seen on five occasions but none of the visits were for any new symptoms or problems with his shoulders. *Id.*

As Dr. Jones opined, no treatment, examination, or work-up of Plaintiff by Defendant Corizon caused Plaintiff any injury or problems with his right shoulder. Additionally, Plaintiff's attempt to connect the May 3, 2014 handcuffing incident to a broken hip sustained during his November 15, 2014 fall is entirely speculative and without any support by a competent medical professional. Plaintiff has failed to come forward with any evidence that Defendants were deliberately indifferent to his medical needs or that inadequate medical care by Defendants resulted in substantial harm to him.

To the extent that Plaintiff alleges that Defendant GEO violated his Eighth Amendment rights when he was handcuffed behind his back, the undisputed facts before the Court suggest no involvement by Defendant GEO's employees, as the May 3, 2014 operation was conducted by NMCD officers. Further, even if Defendant GEO had some involvement, the Court's inquiry would be limited to whether the behind-the-back handcuffing was "a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Given

that Plaintiff was without a medical slip exempting him from behind-the-back handcuffing, the undisputed facts do not support a reasonable conclusion that any officer acted maliciously or sadistically to harm him. *See Miller v. Glanz*, 948 F.2d 1562, 1570 (10th Cir. 1991) (reasoning that handcuffing an inmate in an awkward position for almost two hours did not cause the severe pain or lasting injury required to establish an Eighth Amendment violation).

Based on the undisputed facts before the Court, even when viewed in the light most favorable to Plaintiff, no reasonable jury could determine that Defendants violated Plaintiff's Eighth Amendment rights. The Court, therefore, recommends that summary judgment be granted to Defendants on the claims asserted by Plaintiff in Counts One, Two, and Four.

### D.    *Monell* Liability

In his Amended Complaint, Plaintiff separately pled *Monell* liability in Count Three.  Defendants contend that even if Plaintiff could establish a constitutional violation, which the Court has determined he cannot, they are entitled to summary judgment under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

Notably, while Defendants may be considered "state actors" for purposes of suit under § 1983, they cannot be liable under a *respondeat superior* theory.  *See Herrera v. County of Santa Fe*, 213 F. Supp. 2d 1288 (D.N.M. 2002). As such, in addition to establishing a violation of his constitutional rights, Plaintiff must also allege and prove that a policy or custom of Defendants was the moving force behind such a violation. *See Monell*, 436 U.S. at 690.  For purposes of § 1983 liability, an official policy or custom is a "formally promulgated policy, a well-settled custom or practice, a final

decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013).

Plaintiff's Amended Complaint makes the conclusory allegation that Defendants "had a policy and practice or trade of deliberate indifference to the reality of physical injury to prisoners/inmates which proximately caused Plaintiff's harm." *Doc. 1*, Ex. A, at ¶ 11.  He also asserts various failures to train and/or supervise claims.  *See, e.g., id.* at ¶ 51 ("Defendants had a policy and practice of failing to adequately evaluate, train, monitor, supervise, discipline, enforce policies and otherwise control their agents and employees.")  But Plaintiff does not even identify any policy or custom or any training inadequacy by Defendants that he alleges was the moving force behind purported constitutional violations. For instance, he has not alleged or provided evidence of any pattern of constitutional violations, just as he has not alleged or provided evidence of a need for different training so obvious that it rose to the level of deliberate indifference. Instead, the undisputed facts suggest that there were policies and procedures in place that were designed to protect inmate safety and rights and that Defendants' employees received training on these policies.

Accordingly, even if Plaintiff could survive summary judgment as to an alleged violation of his constitutional rights, Defendants are entitled to summary judgment on the basis that Plaintiff has not created a genuine issue of material fact as to a policy or custom of Defendants that was the moving force behind a constitutional violation. Plaintiff's failure to provide any support for his *Monell* claims constitutes an alternate basis for the Court's recommendation that the Court grant summary judgment to Defendants on his constitutional claims.

**E.  Plaintiff's State Law Claims**

In addition to his federal claims, Plaintiff asserts claims under New Mexico State law for negligence *per se*, negligence, and a violation of Article II, Section 13 of the New Mexico Constitution. *See Doc. 1*, Ex. A, at ¶ 72-77 (negligence *per se*), ¶ 78-84 (negligence), ¶ 80 (N.M. Const. Art. II § 13).

To establish a claim for negligence *per se*, Plaintiff must show: (1) there was a statute or regulation that prescribed certain actions or defined a standard of conduct; (2) Defendants violated that statute or failed to comply with that regulation; (3) he is in the class of persons sought to be protected by the statute or regulation; and (4) the harm or injury to him is of the type sought to be prevented by the statute or regulation. *See Archibeque v. Homrich*, 543 P.2d 820, 825 (N.M. 1975). Plaintiff has not, in his Amended Complaint or otherwise, identified the statute, regulation, or other law that he contends Defendants have violated. Indeed, this claim is pled quite generally in his Amended Complaint, *see* (*Doc. 1*, Ex. A, at ¶ 72-77), and he has offered no evidentiary support for his claim in response to Defendants' Motions for Summary Judgment. Having failed to even allege a particular statutory violation, the Court has little difficulty concluding that Plaintiff is unable to establish the elements of his negligence *per se* claim.  Accordingly, the Court recommends that summary judgment be entered as a matter of law on Count Five.

Count Six of Plaintiff's Amended Complaint asserts claims under New Mexico common law negligence and Article II, Section 13 of the New Mexico Constitution for failing to provide him "with reasonably obtainable and necessary medical treatment." *Doc. 1*, Ex. A, at ¶ 81. Article II, Section 13 of the New Mexico Constitution, like the

Eight Amendment to the United States Constitution, protects individuals from cruel and unusual punishment. *See* N.M. Const. Art. II § 13. Given that this state constitutional provision does not provide broader protections than its federal counterpart, *see Cordova v. LeMaster*, 96 P.3d 778, 781 (N.M. 2004),  the rationale offered by this Court as to Plaintiff's Eighth Amendment claims applies equally to Plaintiff's state constitutional claim. Thus, the Court also recommends that summary judgment be granted as to the claim asserted under Article II, Section 13 of the New Mexico Constitution.

Turning to his negligence claim, Plaintiff must establish that: (1) Defendants owed him a duty recognized by law; (2) Defendants breached that duty; and (3) the breach proximately caused his damages. *See Holley v. Evangelical Lutheran Good Samaritan Society*, 588 F. App'x 792 (10th Cir. 2014). Plaintiff asserts that "Defendants breached their duty of care and were negligent when they failed to provide Plaintiff with reasonably obtainable and necessary medical treatment." *Doc. 1*, Ex. A, at ¶ 81.

Defendant GEO insists that the undisputed facts establish that it owed no duty to provide medical treatment to Plaintiff. Indeed, it was Defendant Corizon, not Defendant GEO, that was charged with providing medical care to inmates at GCCF. Moreover, as noted above, Plaintiff has not even alleged that Defendant GEO's employees somehow impeded or delayed his access to medical care. To the contrary, the undisputed facts reveal that Plaintiff enjoyed relatively frequent access to medical personnel.  He had 176 interactions with health care services in a period of just over two years, 18 of those interactions occurring between the time of his May 3, 2014 handcuffing incident and his November 15, 2014 fall. Ultimately, Plaintiff has failed to designate any specific facts

demonstrating that there is a genuine issue for trial on his negligence claim against

Defendant GEO, and no reasonable jury could return a verdict in his favor.

Defendant Corizon, in turn, insists that absent expert medical testimony offered

on Plaintiff's behalf, summary judgment is also warranted in its favor on Plaintiff's

negligence claim. *Doc. 54* at 60. After a review of Plaintiff's medical records, Dr. Jones

offered the opinion that the care given by employees and/or contractors of Defendant

Corizon to address Plaintiff's right shoulder injuries and pain, which Plaintiff attributed to

the May 3, 2014 handcuffing incident, met or exceeded the applicable standard of care,

not only in a correctional setting, but in any setting. *Doc. 54*, Ex. A, at ¶ 19. Likewise, he

opined that the care rendered to Plaintiff by Defendant Corizon following his November

15, 2014 fall also met or exceeded the applicable standard of care. Furthermore, it was

Dr. Jones opinion that "[n]o harm or damages of any type" were caused to Plaintiff by

the care rendered to him following either incident. *Id.* at ¶ ¶ 20, 28.

Plaintiff, in contrast, has provided no expert medical testimony to rebut Dr. Jones

medical opinions or to establish that any employees or contractors of Defendant

Corizon breached the applicable standard of care or proximately caused any harm or

damages to him.  Under well-established New Mexico law, the testimony of a medical

expert is required "in most medical malpractice suits" in order to establish the applicable

standard of care, to demonstrate that the healthcare provider breached that standard,

and to prove causation. *Holley*, 588 F. App'x at 795 (internal quotations omitted) (citing

*Gerety v. Demers*, 589 P.2d 180, 191 (1978) and *Gonzales v. Carlos Cadena, D.P.M.,*

*P.C.*, No. 30,015, 2010 WL 3997235, at *1 (N.M. Ct. App. Feb. 19, 2010)

(unpublished)). The need for expert medical testimony is the result of the often

"technical and specialized subject matter," *Lopez v. Sw. Cmty. Health Servs.*, 833 P.2d 1183 (N.M. Ct. App. 1992), which is not within the "common knowledge ordinary possessed by an average person," *Gerety*, 589 P.2d at 191.  Therefore, unless the subject matter of the medical malpractice action falls within "an average layperson's 'common knowledge,'" expert medical testimony will be required. *Id.* at 195.

Here, the Court cannot say that the proper treatment of long-lasting orthopedic shoulder problems is a matter within an average layperson's common knowledge. Rather, a medical expert is necessary to evaluate the quality and nature of the medical treatment provided for Plaintiff's shoulder problems and to determine whether any such treatment may have proximately caused any injury to his shoulders or ultimately to his hip.  More particularly, without expert testimony, Plaintiff cannot establish that his "shoulder strength gave out" because of some lasting injury caused by the May 3, 2014 handcuffing incident or even that the handcuffing incident somehow exacerbated a prior shoulder injury or condition. This is particularly true where Plaintiff had experienced ongoing pain and problems with his shoulders since the mid-1980s.

Ultimately, without any expert medical testimony or other support for his negligence claims, the Court concludes there are no genuine issues of material fact as to whether the medical care and treatment provided to Plaintiff by Defendant Corizon was below the minimum standard of care or whether it proximately caused any injuries to Plaintiff. As with his other claims, Defendants are entitled to summary judgment on Count Six.

## V. Conclusion

For the foregoing reasons, the Court recommends that Defendants Motions for Summary Judgment (*Docs. 52 & 54*) be granted, that Plaintiff's request for a settlement conference (*Doc. 61*) be denied, and that Plaintiff's claims in this case be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).

**A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

_____

UNITED STATES CHIEF MAGISTRATE JUDGE